The STATE of Ohio

v.

ENGLE▊

Court of Common Pleas of Ohio,
Fairfield County.

No. 91–CR–AG–0170.

Decided Jan. 24, 1997.

Judgment Entry March 24, 1997.

---

*Gregg Marx,* Assistant Fairfield County Prosecuting Attorney, for the state.

*Kort Gatterdam,* Assistant State Public Defender, and *Max Kravitz,* for defendant.

---

FRED J. SHOEMAKER, Judge.

The Supreme Court of Ohio in *State v. Engle* (1996), 74 Ohio St.3d 525, 525–526, 660 N.E.2d 450, 451, stated:

"Appellant, Edna Mae Engle, and her husband, John Engle, Jr., were the parents of ten children. On July 9, 1991, John Engle's sister reported to the Fairfield County Sheriff's Office that she believed the Engle's son Christopher was dead. She stated that appellant had told her some weeks earlier that John Engle had killed Christopher. Subsequently, Mrs. Engle gave a statement to investigators that her husband had poured scalding water on Christopher and that Christopher had died two days later. Mrs. Engle was indicted on August 2, 1991, by the Fairfield County Grand Jury on one count of aggravated murder with a death-penalty specification, two counts of abuse of a corpse, three counts of forgery, two counts of perjury, sixteen counts of child endangering, one count of obstruction of justice, and one count of theft. The theft and forgery counts related to welfare fraud.

"Trial began on August 25 before a jury. The state rested on September 4, and the court overruled a defense motion for acquittal. After the defense gave its opening statement on September 8, but before any evidence was presented, the state filed a motion *in limine* to prevent appellant's expert and others from testifying about duress and the battered woman syndrome. The court granted

the motion. Defense counsel then asked for a recess to confer with the prosecution.

"Following the recess, the state announced that the defendant would be changing her plea to several counts in the indictment. 'We further anticipate the Defendant filing an appeal to appeal the Court's rulings that have been rendered previously in this case,' the prosecutor informed the court. 'Certainly, she is permitted to file an appeal pursuant to this negotiated plea.' The prosecutor further informed the court that the state would be dismissing the remainder of the counts 'without prejudice only if she wins her appeal and is entitled to a completely new trial.'

"Defendant then pleaded no contest to one count each of murder, obstruction of justice, and theft, three counts of forgery, two counts of perjury and six counts of child endangering. The court then found her guilty on those counts and sentenced her to fifteen years to life on the murder charge, to be served consecutively, and to a term of nineteen and one-half years on the other charges.

"On appeal, the Court of Appeals for Fairfield County in a split decision held that under Crim.R. 12(H), appellant had waived the assignments of error that were based on the trial court's refusal to allow testimony on the battered woman syndrome or duress and the trial court's refusal to dismiss the aggravated murder and child endangering counts for insufficient evidence. The court of appeals also rejected appellant's claim that her plea had not been voluntary because it was based on a belief that she could appeal certain issues."

The Supreme Court of Ohio reversed the conviction, holding that defendant's plea was not made knowingly or intelligently. The court remanded the cause to the trial court with instructions that Mrs. Engle be given the opportunity to withdraw her plea and proceed to trial and the state be allowed to reinstate the original charges.

After the local judges recused themselves from handling the retrial, the Chief Justice of the Supreme Court of Ohio appointed me to handle all further proceedings in this case. The court appointed Kort Gatterdam, Assistant State Public Defender, as counsel for defendant. Mr. Gatterdam had Max Kravitz act as his co-counsel.

The defendant filed many motions, which were set for an oral hearing. The court changed the venue of the retrial to Franklin County, and reduced defendant's appearance bond to $40,000 cash, but limited defendant's right to personally contact her children. However, her children were given the right to contact her if they so desired. The court set November 4, 1996 for a jury trial. While the appeal was pending, defendant was unable to post the $100,000 cash appearance bond; therefore, she was incarcerated for fifty-seven months. However,

after this court reduced the cash appearance bond to $40,000, her family posted the bond.

Approximately six weeks prior to the trial date, counsel requested a pretrial meeting to discuss whether the court would be willing to accept a plea bargain agreement.

Counsel did not know the exact counts to which defendant would enter a guilty plea, but it was agreed that the court would hold a two-day sentencing hearing and then decide whether to return the defendant to prison for up to an additional six years or immediately place her on probation. The parties further agreed that the court would read and consider all the testimony in her first trial, as well as the testimony submitted to the trial court on the motion *in limine*. The court agreed to this arrangement and, furthermore, at the request of the state, changed the venue back to Fairfield County. The sentencing hearing was set for December 16 and 17, 1996.

Since I read all of the Supreme Court of Ohio's opinions, I would have read the *Engle* opinion. However, I never gave it any special attention and do not believe that I read or watched in the newspapers or television anything about this case.

Prior to and at the sentencing hearing, I advised counsel that I would most likely announce my decision from the bench on December 17. Pursuant to the plea agreement, I spent about thirty hours reading the entire record and making notes. Additionally, on the evening of December 16, I spent another five hours studying admitted evidentiary material. After listening to all the evidence and arguments, it was absolutely clear to me that only Mr. Engle killed his son, Christopher. Also, he undoubtedly previously killed his daughter, Robin, in January 1976. John Engle was an alcoholic sociopath. The drunker he became, the more vicious he became. He battered and brutalized his wife and all of his children. His motto was "I'm the father and I can do whatever I want. Don't anybody interfere. If you do, I'll kill you." He ran a house of horror and fear. His wife and children were terrified by him and would do or say anything he commanded to protect themselves from his brutal physical abuse.

## FINDINGS OF FACT

(1) John Engle served in Vietnam and received a medical (psychiatric) discharge. He was advised to obtain psychiatric help, but he never did.

(2) Edna Mae Engle married John Engle II (John), in December 1972. They lived in Columbus, Ohio.

(3) After about one year of marriage, John began to physically and mentally abuse Edna.

(4) John Engle III (Johnnie) was born on September 15, 1973.

(5) In 1974, the family moved to Escanaba, Michigan, where daughter Robin was born on December 15, 1974.

(6) On the evening of August 14, 1975, an informant called the Escanaba Police Department and reported:

"John and his family were staying with them and that last night he (John Jr.) beat up John the III and left marks on him, then tonight he (John Jr.) put the little girl Robin in the freezer till she stopped crying and then he bit his wife Edna on the nose. John Jr. then left the house. The informant stated that he, John Jr., was going to get a gun. * * *"

Edna was placed in protective custody with her children.

Edna moved out of the family home and was placed under protective custody with the two children. The Escanaba Social Services Department conducted an investigation. Edna was determined that she was going to obtain a divorce. However, she was without funds and had just applied for public assistance. Carolyn Johnson (John's sister) filed petitions against both Mr. and Mrs. Engle alleging child neglect. Carolyn's false allegations stopped Edna from leaving John and returning to her home in Ohio because she had to appear in court. The social services department recommended that the children be placed with Mrs. Engle under court supervision. It further recommended that John obtain mental health counseling and/or psychiatric treatment.

The social services employee stated: "Mrs. Engle is a weak, possibly very frightened person. She does not seem to have an adequate personality in being assertive with her relationship with her husband."

However, when this case came to court, the judge ordered the Engles to resolve their problems and take care of the children. Therefore, Edna moved back in with John. Carolyn Johnson had successfully thwarted Edna's plan to obtain a divorce and return to her family's home in Ohio. Carolyn knew how to manipulate the judicial process.

(7) In January 1976, their daughter Robin (thirteen months old) was killed by inhalation of pepper in her throat. John told the authorities that their son Johnnie (two and one-quarter years old) had unscrewed the lid on the bottle of pepper and poured it down Robin's throat. By this time, Edna was a battered and brutalized wife who always made excuses for John's brutality. She and Johnnie were asleep at the time of this incident. John always told Edna that he would hunt her down and kill her if she ever tried to leave or prosecute him. She believed him.

(8) The family moved to Columbus, Ohio around January 17, 1978. Angela was born on July 5, 1976, and Timothy was born on November 10, 1977. John said Timothy was retarded and frequently abused him. Franklin County Children Services received complaints that Timothy had bruises. Johnnie told them that the father had beaten Timothy because he couldn't walk. The father was reported to be unemployed and to drink a lot, curse, scream and beat the mother.

(9) When the caseworker from Franklin County Children Services visited the Engle home on July 11, 1980, she wrote:

"There have been allegations of John _____ drinking alcohol excessively and of him beating Mrs. _____ and Timmy, but Mr. and Mrs. _____ have consistently denied these allegations.

"Edna _____ appears exhausted and nearly overwhelmed by her household and parental responsibilities. She spends much time preparing meals, cleaning the house and keeping the children clean, but appears to find little time to play with any of the children. Standards of home and personal hygiene appear average to above average.

" * * *

"Timmy would appear to be developmentally delayed. During my earlier contacts, he appeared non-alert and withdrawn."

Because of the brutal treatment to Timothy, he was later removed from the Engle family, placed in a foster home, and then adopted.

(10) In November 1980, the Engle family moved to Rushville, Fairfield County, Ohio. On December 16, 1980, Franklin County Children Services sent a letter to Fairfield County Children Services which stated in part:

"I cannot stress the seriousness of this situation as seen by reading the material from Michigan. The family had another child, Robin Engle, who is now deceased. The autopsy said that she died from pepper poisoning. Again this is unsubstantiated abuse from the parents. However, we do have substantial abuse on Timmy."

(11) When a representative of Fairfield County Children Services ("FCCS") named Jill visited the Engle home on January 4, 1985, she found Edna with two black eyes. She reported:

"John was forward and overly friendly. I feel he was on drugs/alcohol. Children appeared adequately dressed and were eating grapes. John told Jill *he is planning on getting Edna pregnant next week. He said it was the right time. Edna told Jill she wanted to have her tubes tied. John said nothing to it.*" (Emphasis added.)

(12) The Engles lived in a trailer in Rushville. John was never employed. The family received a monthly check from Aid for Dependent Children for approximately $770, plus food stamps. John would get the check, pay the rent, and then spend the rest of the money on beer. He kept his beer in a locked refrigerator located outside the home and in his car. He also fixed the refrigerator inside the home in such a manner that only he could open it. They had two meals a day. Edna and the children were prisoners in the trailer. John had a portable telephone and whenever he left the home he took it with him. Edna was not permitted to go the mailbox, or even outside the home unless it was in his presence. The children were also ordered to stay inside the home and if he caught them outside the home when he returned to the home, they would be severely punished. However, many times Edna would tell John she gave the children permission to go outdoors so he would beat the hell out of her rather than the children.

(13) John was an alcoholic sociopath who could easily fool investigators because he was a manipulator and his wife and children were too terrified to tell the truth. Edna was a very timid and passive person. She loved her children and constantly endured beatings. She did not have the ability to escape and still save her children. The investigators conducted the interviews in the family home.

(14) John would hang Christopher, who was about four and one-half years of age with a severe developmental problem, on nails and on the door knob and then slam the door. He also made Christopher sleep in the bathtub because he soiled his pants. Every member of the family wanted to help Christopher, but it was impossible because John would not tolerate any interference. Finally on March 10, 1989, John put Christopher in scalding water that proximately caused his death. John would not permit anyone to take Christopher to the hospital. John was the only person that had the keys to the car and an Ohio driver's license, although he had Johnnie drive when he was too drunk. Incidentally, after the scalding of Christopher, Edna tried to carry out Christopher, but John caught her and beat her unconscious with pliers.

Christopher died the next morning. John wanted to put his body in the garbage container. Edna pleaded that at least he give Christopher a burial. John placed Christopher's body under the trailer wrapped with a sheet. When his body created an odor, John started a fire and cremated the body.

John told Edna to tell the children that Christopher had been taken to Edna's mother's home. One of the Engle children saw Christopher's body being burned. However, neither Edna nor any of the surviving children disclosed this information prior to John and Edna's arrest. Edna had absolutely nothing to do with Christopher's scalding. She was not even in the room when it happened. One of

the children called to her that Christopher needed help. Neither Edna nor any of the children desired or encouraged John to scald Christopher.

Previously, Edna had placed Christopher in the Forest Rose School for Children with Developmental Disabilities. However, John refused to let him stay in that school.

(15) John raped his daughter Angela when she was fifteen years of age. Later Angela told a friend. However, when she was questioned about the incident, she denied it because of her fear of her father. Again, the interview was not done in a private, neutral setting.

(16) John shot Johnnie in the foot with his gun. He always threatened to shoot anyone that crossed him. He told Johnnie to go to the hospital and tell them he accidentally shot himself. The doctor at the hospital notified FCCS because he did not believe Johnnie's story. John also hit his son, Joey, on his forehead with a screwdriver. He bled very badly, but John would not take or permit anyone else to take him to a doctor. The injury left Joey with a scar.

(17) John desired sex with Edna about three to four times a week. When she would refuse, he would kick her in the crotch with his cowboy boots, throw her on the bed, and then make her submit to anal and vaginal intercourse. He also kicked her on her varicose veins.

(18) Dr. Teresa Quinlan testified that she saw Edna several times and noticed bruises on her body. "I asked, 'Is your life in jeopardy?' and she started crying more. And I said, 'Edna, please, if you can't tell me—.' I offered her the Lighthouse." John was standing outside the door and was scheduled for the next appointment. However, he left without keeping his appointment. Many times his threats were not verbal. He would show a very stern look, a change in facial expression.

Dr. Quinlan had her nurse call FCCS's office anonymously on two occasions.

(19) Edna went to the Lighthouse Center, a program for battered women in Lancaster in 1989. The Engle children misbehaved at the center and Edna was fearful that they would be taken from her. She entered the program with six of her children on August 11 and left on August 14. Edna was very concerned about her oldest son, Johnnie, who had been at work at the time she left home. At the time of this admission, she had a bruise under her eye which had been inflicted by John. She left home after her sister-in-law, Carolyn, had moved into the Engle household with her sixteen-year-old foster son/boyfriend. Edna was particularly concerned about Joey's safety because of the escalating abuse by her husband towards Joey since the death of Christopher. Angela and the rest of the family also testified that they were afraid that Joey would be their dad's next victim.

The center noted that the children were urging her to return home. The counselor noted that she "seemed determined to make improvements in her home life." It was also noted that she was "at high risk for further abuse in the future."

(20) John told all the children, in Edna's presence, that their mother was a slut and a whore, that her only job was to do the cooking, washing and cleaning, and that she had no authority over the children.

(21) The children hid when John would beat Edna with his fists and kick her with his cowboy boots.

(22) Edna was not permitted to contact anyone outside the home. In June 1982, the police came to her home to tell her that her father had died of lung cancer. John told Edna that her father was dead and that he had deserved to die. John refused to allow Edna to go to the funeral home or contact any of her relatives.

(23) Joyce Preston, a teacher at Fairfield County Board of Mental Disabilities, testified that on September 4, 1986, Christopher was covered with bruises, lacerations, scratches and cigarette burns. Joyce Preston was devastated. She told her supervisor to telephone Children Services.

(24) Angela Engle gave the following information to an FCCS investigator after her parents' arrest:

"Her father had hit her with a belt buckle more than once. He would hit anyone that tried to stop his physical abuse of Edna or any of the children. He would knock Edna down and then kick her in the head with his steel-toed cowboy boots. He also threw a wrench at Angela and hit her in the head. He beat up Edna when the monthly welfare money was received. He tried to drown Christopher many times. When John scalded Christopher, Edna was in the kitchen and told John to get away."

Angela further testified that when her dad was hitting Aaron and she tried to stop him he said: "No one tells me to stop, I'm your father." She believed that Joey would be his next victim. Furthermore, Angela was raped by her father on more than one occasion.

(25) Walter Ring, Director of the Fairfield County Department of Human Services, testified, and the court finds, that benefits were not to be spent on alcohol or cigarettes, and that John Engle knew the rules and picked up the drafts.

(26) Frederick Burns, principal of the Rushville Middle School and the Bremen Elementary School, testified, and the court finds, that Rodney Engle came to school with an injured eye. He said that someone on the bus hit him with his fist.

(His father had hit him with his fist.) Burns did not believe Rodney's story. He talked to the bus driver. The Department of Children Services was notified of this incident.

(27) Rodney made the following statement to a caseworker after his parents were arrested, which the court finds to be true:

"Dad would hit me with his fist, broomstick or belt buckle. Dad said he was going to kill us. Dad beat up mom all the time. Maybe mom hit me with a broomstick about five times in my life and never very hard. None of the children paid much attention to mom unless she got a broomstick and said she meant it. Dad had Johnnie steal beer for him."

He further said:

"Adam shot the cage (not the rooster) with a BB gun. Dad almost broke Adam's leg and hit me in the eye with his fist. Dad hurt me bad.

"I saw Chris when dad burned him in the hot water. Christopher had blisters all over him. Dad broke them with a broomstick.

"Dad beat up mom if she tried to protect the kids. He would throw her down, pick her up, and then throw her down. *I was scared to tell anyone*, because dad would beat me. He beat me with the buckle, knocked me down, and he beat and scared Angie.

"Dad would get drunk and tell Angie, you'd better hide my beer because I don't want Edna drinking my beer. And if there is some missing that's when he started beating the crap out of us. He'd say, 'Get the gun I'll shoot her.' Then he would find the beer locked in his automobile trunk." (Emphasis added.)

Rodney further testified that his father struck him with a hammer upon his left shoulder, leaving a scar.

(28) Johnnie testified, and the court finds, that Edna Engle never abused any of the children. She interceded on their behalf many times, thereby taking serious physical beatings from John.

After quitting school at the age of sixteen, Johnnie worked and made about $250 a week. His father took all of it but $5 to $10 for beer money.

The court finds that Johnnie and his wife have two children and a close relationship with his mother. He has a steady job, and he deserves a lot of credit because he was raised in a horror chamber.

Johnnie showed the caseworker where the father had struck him in the head several years ago with a metal lighter, causing two separate scarred areas on top of his head in addition to John shooting him in the foot.

(29) On May 30, 1990, Edna called the police because her husband had struck her in the nose and mouth. When the police arrived, she had dried blood on her shirt and face. Edna filed domestic violence charges and obtained a temporary restraining order. The following day, May 31, 1990, *John was released on a $1,000 recognizance bond.* The case was set for a pretrial hearing on July 11, 1990. John came home and promised he would go back to the doctor, and be under his care again. He also promised that he would not drink anything, or even hit Edna again if she would let him come home. She said she believed that he had learned a lesson, so she requested a withdrawal of the temporary restraining order. The case was nolled.

(30) On July 22, 1991, the FCCS closed the Engle case, stating in part:

"The following is recommended:

"REFERRAL #1: Low risk of abuse and neglect substantiated. The family referred to another agency for services. Case closed. The family was referred to parenting classes at New Horizons.

"REFERRAL #2: *Little or no risk of child abuse neglect. Case Closed.*" (Emphasis added.)

(31) On July 9, 1991, Carolyn Johnson, John's sister, went to the Fairfield County Sheriff's Office and told them that her brother, John, had told her that he had killed his son and then buried him in a cow pasture behind the residence.

(32) John had told the family that he had been advised by a doctor that he had only two years to live. The family believed this statement, and hoped that things would get better. Also, when John was administering beatings he would play loud music.

(33) Dr. Kristen E. Haskins, Psy.D. (clinical and forensic psychology) conducted an extensive interview and testing of Edna in April and May 1992, and wrote a twenty-nine-page report stating:

"Overall, the psychological test results indicated that Ms. Engle was, in October 1991, a significantly distressed woman who recognized words at the beginning eighth grade level, functioned intellectually at a high mild mental retardation to low borderline level and may have organic brain dysfunction. Given her reported history of reported blows to her head with various objects and the numerous scars on her head from these blows, further neurological assessment would appear warranted."

Dr. Haskins concluded that Edna has a severe posttraumatic stress disorder with panic attacks. Edna also has a borderline intellectual functioning and a dependent personality disorder. Dr. Hoskins testified that Edna was a battered and brutalized woman.

Dr. Hoskins's testimony was not refuted. She was a highly intelligent and credible witness.

(34) Dr. Jill W. Bley, Ph.D. (clinical psychologist) was also a very intelligent and credible witness, and she testified as follows:

"It is my opinion, within a reasonable degree of psychological certainty, that Edna Mae Engle is, indeed, suffering from all the symptoms of Battered Woman Syndrome, including severe levels of Type II PTSD, an established pattern of victimization and learned helplessness.

"It is further my opinion that the duress created by her terror, fear, shame, humiliation, learned helplessness, anxiety, low self-esteem, suicidal ideation, confusion, overwhelmingness, memory loss, somatic events, [and] repeated occurrences of cognitive and visual representations of the traumatic events inherent in the severe degree to which she experiences the symptoms of Battered Woman Syndrome and reported to this evaluator and others, rendered her incapable of intervening to prevent the death of her son, Christopher or prevent injury to her other children."

## SUMMARY

(1) Because Christopher soiled his pants, John Engle II killed his son, Christopher. He was angry and drunk. He scalded him in the tub. Neither his wife nor any of the children knew that John was going to do this horrific deed. Edna was in the living room at the time Christopher was scalded.

(2) John did not take Christopher to the doctor or hospital and refused to let their son Johnnie or anyone else take Christopher to the doctor or hospital. All family members testified that John wedged a screwdriver in the floor every night and forbade anyone to leave the premises. When Edna pleaded with John to get medical help for Christopher and showed him the blisters on his side, John told her "to get out of here." He then beat her in the head. John told Edna to leave Chris alone. She again asked John to take Chris to the hospital and he refused. He then brutally beat her with a pair of pliers, knocking her unconscious. John told Edna that Christopher died because she did not take proper care of him.

(3) Edna was genuinely suffering from a battered woman syndrome. She is borderline mentally retarded. She is a quiet, submissive, helpless, and overwhelmed person who did not believe, with her children, that they could escape from John. Her only real chance to escape from John was in Michigan, but her sister-in-law, Carolyn Johnson, filed false charges. A judge later told her to go back to John and raise their children. John, thereafter, killed his daughter, Robin, by pouring pepper in her throat because she cried too much.

(4) John was in complete control of the household. He threatened to kill anyone in the family who disobeyed his orders. John was a sociopathic drunk. He not only regularly beat Edna, but he also beat all the children and even raped his daughter.

(5) It is disappointing that caseworkers did not realize the necessity of conducting private interviews in a neutral place after receiving many complaints of spousal and child abuse.

(6) John never worked while the family lived in Rushville. He took monthly Aid for Dependent Children ("ADC") checks of approximately $770. He paid the rent and spent the rest on beer. If he ran out of beer or cigarettes, he would order one of the children to steal.

The law requires that none of the ADC money shall be spent on alcohol or cigarettes. Obviously, the Fairfield County Department of Human Services did not enforce this law.

(7) Edna did not abuse any of her children. John told his children that their mother could not make them do anything. When they ran away from their foster home, both Johnnie and Rodney told a neighbor, contrary to newspaper articles, that their mother never abused them. Angela's testimony, to the contrary, is not believable. I believe that she was influenced by Carolyn Johnson.

(8) After the Engles' arrest, FCCS placed Johnnie and Angela in the care of Carolyn Johnson. Later, however, Johnnie and Angela admitted to going to bars with Carolyn. They also indicated that on previous occasions (before FCCS's involvement with the children's placement with their aunt, Carolyn) they had stolen items at various grocery stores, specifically cigarettes, at Carolyn's request. Caseworker Braden phoned Carolyn at work and advised her of the recent involvement. Carolyn had no response to these concerns. Thereafter, the court granted shelter custody of Johnnie, Angela and Aaron to FCCS.

(9) I believe there is a great deal of public disinformation in the Lancaster community regarding Christopher's death. That is one of the reasons I have spent many hours writing this decision.

(10) Finally, John Engle's brutal conduct toward his wife and children will be forever imbedded in my mind. Edna has served fifty-seven months in prison. In my best judgment, based on all the evidence, including the exhibits, it would be criminal for any judge to send her back to prison. I do not believe in guilt by association. The facts speak for themselves.

## JUDGMENT ENTRY

### Filed March 24, 1997

On October 28, 1996, defendant, Edna M. Engle, came before this court and withdrew her previous not guilty plea. Pursuant to a plea agreement and waiver

upon plea of guilty filed October 28, 1996, Ms. Engle pled guilty to a reduced charge of involuntary manslaughter in count one of the indictment. She also pled to ten other felonies without specifications. The charges Ms. Engle pled guilty to are reflected in the waiver upon plea of guilty and the plea agreement. In exchange for her pleas of guilty, the state of Ohio dismissed all remaining counts and specifications in the twenty-six-count indictment.

The parties agreed in the plea agreement that Ms. Engle would receive probation on the involuntary manslaughter charge. The parties further agreed that this court could impose a sentence from probation to six years' additional incarceration for the ten other felonies for which guilty pleas were entered.

The parties agreed that there would be a two-day sentencing hearing at which they would present evidence to assist this court in deciding what sentence to impose. The sentencing hearing was held on December 16 and 17, 1996, in the Fairfield County Court Common Pleas Court.

On December 17, 1996, this court announced its decision orally. Further, on January 24, 1997, this court filed a written decision. Based upon all the evidence in this case and for the reasons stated orally and in writing by this court, Edna M. Engle is hereby sentenced as follows:

(1) On Count 1, involuntary manslaughter, a sentence of five to twenty-five years in prison. The sentence is suspended, and Ms. Engle will be placed on five years' probation or until further order of this court.

(2) On Counts 4, 6, 8, 10, 12, 16, 18, 20, 22, and 24, a sentence of one year in prison for each count. These sentences are to be concurrent with each other and consecutive to the sentence in Count 1. Further, these sentences are suspended, and Ms. Engle is to be placed on five years' probation or until further order of this court for all of the aforementioned counts.

(3) Although no further incarceration is being imposed at this time, should incarceration occur in the future, this court finds that Ms. Engle is entitled to fifty-seven months' credit for time previously served in the county jail, prison, and the Timothy B. Moritz Forensic Unit.

Ms. Engle's probation will be governed by the standard terms and conditions of the probation department subject to the following conditions and/or exceptions:

A. Ms. Engle's probation will be handled through the Fairfield County Probation Department, but Ms. Engle can have her probation transferred to Franklin County.

B. This court hereby adopts the treatment recommendations of Dr. Kris Haskins found in page 29 of her report dated December 10, 1996, and orders the probation department to monitor and work with the mental health professionals

who are currently treating Ms. Engle to attempt to attain the goals suggested by Dr. Haskins. The treatment recommendations are as follows:

(1) Ms. Engle is in need of continued psychiatric oversight and medication evaluation to treat her significant anxiety and depression.

(2) Ms. Engle is in need of individual psychotherapy with an individual skilled and experienced in treating severely battered women.

(3) At a point to be determined by her individual psychotherapist, Ms. Engle could benefit from participation in a therapy group for severely battered women.

(4) Ms. Engle could benefit from vocational assessment and training. This could be addressed by a referral to the Bureau of Vocational Rehabilitation. However, such a referral should be delayed until it can be recommended by her individual therapist. In the interim, she might be advised to apply for Social Security benefits on the basis of her severe posttraumatic stress disorder with panic attacks.

(5) Ms. Engle should be encouraged to develop some social contacts of her own within her community. This might be accomplished by attending the church of her choice or joining another community or social organization of her choice.

Since the defendant is indigent, the court costs will be waived. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

*So ordered.*

FRED J. SHOEMAKER, J., retired, of the Franklin County Court of Common Pleas, sitting by assignment.